Ilene Sands
1040 Bush St #208
SF, CA 94109
(415) 673-6768

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

**CW**

**CV 09    5401**

E-filing

| | |
|---|---|
| ILENE SANDS, IN PRO PER, | FOR VIOLATION OF CIVIL RIGHTS, VIOLATION OF THE CITY OF SAN FRANCISCO NO SMOKING BAN IN BUILDINGS, NEGLIGENCE, CONSTRUCTIVE EVICTION, FRAUD, MONETARY DAMAGES AND INJUNCTIVE RELIEF |
| Plaintiff, | |
| vs. | |
| CAL PROPERTIES WOMANS DIV., THE MARY ELIZABETH INN RESIDENTIAL HOTEL, AMANDA HEIER, CARLA BELLE and JOHN ZANGHI | |
| Defendants. | |

I. INTRODUCTION

1. In this action, ILENE SANDS ("plaintiff"), seeks injuctive, declaratory and monetary relief against defendants THE MARY ELIZABETH INN RESIDENTIAL HOTEL, CAL PROPERTIES WOMANS DIV., AMANDA HEIER, CARLA BELLE AND JOHN ZANGHI for discriminating against housing applicants, tenants, and occupants with physical or mental disabilities in violaton of federal and state fair housing laws.

-1-

## II. JURISDICTION AND VENUE

2.  Jurisdiction is conferred upon this Court pursuant to 28 U.S.C. & 1331 in that the claims alleged herein arise under the laws of the United States. This court has supplemental jurisdiction pursuant to 28 U.S.C. & 1367 to hear and determine the plaintiff's state law claims because those claims are related to plaintiff's federal law claims and arise out of a common nucleus of related facts. Plaintiff's state law claims are related plaintiff's federal law claims such that those claims form part of the same case or controversy under Article III of the United State Constitution.

3.  Venue and intradistrict assignment are proper in that the claims alleged herein arose in the City and County of San Francisco, State of California.

### III. PARTIES

4.  Plaintiff Ilene Sands is and was at all times relevant hereto an African American citizen of the United States who is readily identifiable as a member of the Black race and who resides in the City and the County of San Francisco, State of California.

5.  Defendant THE MARY ELIZABETH INN RESIDENTIAL HOTEL is a business establishment located at 1040 Bush Street in the City and County of San Francisco, California.

6.  Defendant CAL PROPERTIES WOMANS DIV. is located in New York, New York.

7.  Defendant AMANDA HEIER is at all times relevant hereto an officer and/or agent and/or employee of defendants MARY ELIZABETH INN and CAL PROPERTIES WOMANS DIV. In doing the things herein alleged, said defendant was acting within the scope and course of such agency and/or employment, and with the knowledge, permission, and authorization of the acts complained of herein.

8.  Defendant CARLA BELLE is and was at all times relevant hereto an officer and/or agent and /or employee of defendants MARY ELIZABETH INN and CAL PROPERTIES WOMANS DIV. In doing the things herein alleged, said defendant was acting within the scope and course of such agency and/or employment, and with the knowledge, permission, and authorization of the acts complained of herein.

9.  Defendant JOHN ZANGHI is and was at all times relevant hereto an officer and/or agent and/or employee of defendants MARY ELIZABETH INN and CAL PROPERTIES WOMANS DIV. In doing the things herein alleged, said defendant was acting within the scope and course of such agency and/or employment, and with the knowledge, permission, and Authorization of the acts complained of herein.

-2-

## IV. DISABILITIES

A. Since childhood I've had a history of various immune allergies, hay fever and excema skin rashes – that caused me to be allergic to soaps and skin products with perfumes.

B. As a young adult I learned that I was also allergic to nickel, when pierced earrings that I wore with nickel caused me to have a severe ear and facial swelling and infection which resulted in my being hospitalized and treated for an infection by my dermatologist.

C. In my thirties I developed asthma and I was hospitalized for bronchial asthma in 1988.

D. In 1990 / 1991 I was diagnosed with a 3 cm lesion in the left temporal lobe area of my brain (with an unknown etiology in the area that controls my speech).

E. In 1991 I got the additional condition of being "sensitive to chemicals" (smelling, breathing, and touching them) after a doctor misdiagnosed my brain lesion as being a brain fungus infection and gave me high dosages of the medication diflucan that AIDS patients and the ACT UP organization was picketing the National Institution of Health to release so that AIDS patients wouldnot have to die from fungal brain infections. However, because I did not have AIDS or fungus in my brain (that an earlier spinal and testing had showed) the medication burned my brain and the lesion in my brain – and caused me to have infection drain from the inner left side of my jaw for 4 months, to have facial swelling and pain in my head and face, the inability to open my mouth or talk without pain, difficulties with walking (problems with my left gate), back pain and I was bedridden for a year with my doctor giving me house visits – with the treatment of antibiotics.

F. In 1992 after taking antibiotics for a year I was diagnosed with C Diff Bacteria in My colon, stomach ulcers and ulcerated colitis – which later developed into inflame-Matory bowel disease. And during the past 2 years I've been diagnosed with having "severe inflammatory bowel disease" and I've been hospitalized close to 10 times during the past year for this condition.

G. As an adult I've seen psychologist for the trauma that I experienced in my childhood when I was verbally abused and physically abused (between the age of 6 & 18) by my step father – at a time when there were no laws to protect me from the abuse.

## V. FACTS

10. On or about May 27, 2009, I plaintiff, became a resident at MARY ELIZABETH INN

RESIDENTIAL HOTEL. As part of the terms of my residency, I was entitled to occupy a single room, be issued a key to my mail box and receive two meals per day in exchange for payment of a monthly rental fee.

11.  However, immediately upon moving into MARY EZLIZABETH INN I noticed the manager CARLA BELLE'S lack of support and interest in acknowledging my rights as a tenant. Specifically: (a) Even though the administrative day clerk, CECELIA, told me that the former resident in my room "had taken the mail box key and she would have to put in a work order request so that I could get a key," and I relayed what she Said to CARLA on the same day, 5 months have gone by and I have yet to be issued a mail box key – when other residents have keys to get into their mail boxes. (b) And though I made a second work order request for a mail box key to another desk clerk named REBECCA and wrote an incident report about why I needed a mail box key (around the last week of October 2009) and forwarded it to CARLA, CARLA has yet to respond to my request. And when you consider that I included in the complaint / report that I missed an important appointment that I was informed of by mail (that REBECCA desk clerk witnessed) because one of the desk clerks didn't get my mail from my mail box in a timely manner, CARLA should hve responded to my incident report/complaint.

12.  Also, shortly after moving in a number of residents told me that when they moved in they had a microwave and a small refrigerator in their rooms. But I was never given this same accommodation. And though I asked CARLA If I could be given a microwave and a refrigerator, she referred me to NICHOLE, the case manager that I was assigned to and NICHOLE told me "that she couldn't help me to get a micro-wave or a refrigerator because I wasn't apart of a program" – even though MARY ELIZABETH INN gets federal funding and all residents should be given the same terms and conditions in their accommodation upon moving in. Particularly when I weighed 73 pounds and was having colon problems and could have benefited from refrigerating food (yogart, eggs, mac and cheese etc.) that could have helped me to gain weight and would have been better for my colon. Because the cook at MARY ELIZABETH INN often prepares food that is too spicy.

13.  Then after a month of living at MARY ELIZABETH INN, (around the last week of June 2009), I noticed that a lot of odors and fumes had been getting into my room from one of the neighboring units (the room above, below or beside me) – so I went to CARLA and asked if she could please tell the above mentioned neighbors about my disabilityof asthma, allergies and chemical sensitivity and request in a non accusatory way – if they not over use cleaning and chemical products to the extent that they odors would get into my room. Although CARLA told me that my request was reasonable, she neve got back to me to tell me if she had spoken to my neighbors or to ask me if my situation had changed. More importantly, she never told me when I met with her in June 2009 that I should file an in house com-

-4-

RESIDENTIAL HOTEL. As part of the terms of my residency, I was entitled to occupy a single room, be issued a key to my mail box and receive two meals per day in exchange for payment of a monthly rental fee.

11.   However, immediately upon moving into MARY EZLIZABETH INN I noticed the manager CARLA BELLE'S lack of support and interest in acknowledging my rights as a tenant. Specifically: (a) Even though the administrative day clerk, CECELIA, told me that the former resident in my room "had taken the mail box key and she would have to put in a work order request so that I could get a key," and I relayed what she Said to CARLA on the same day, 5 months have gone by and I have yet to be issued a mail box key – when other residents have keys to get into their mail boxes. (b) And though I made a second work order request for a mail box key to another desk clerk named REBECCA and wrote an incident report about why I needed a mail box key (around the last week of October 2009) and forwarded it to CARLA, CARLA has yet to respond to my request. And when you consider that I included in the complaint / report that I missed an important appointment that I was informed of by mail (that REBECCA desk clerk witnessed) because one of the desk clerks didn't get my mail from my mail box in a timely manner, CARLA should hve responded to my incident report/complaint.

12.   Also, shortly after moving in a number of residents told me that when they moved in they had a microwave and a small refrigerator in their rooms. But I was never given this same accommodation. And though I asked CARLA If I could be given a microwave and a refrigerator, she referred me to NICHOLE, the case manager that I was assigned to and NICHOLE told me "that she couldn't help me to get a micro-wave or a refrigerator because I wasn't apart of a program" – even though MARY ELIZABETH INN gets federal funding and all residents should be given the same terms and conditions in their accommodation upon moving in. Particularly when I weighed 73 pounds and was having colon problems and could have benefited from refrigerating food (yogart, eggs, mac and cheese etc.) that could have helped me to gain weight and would have been better for my colon. Because the cook at MARY ELIZABETH INN often prepares food that are too spicy.

13.   Then after a month of living at MARY ELIZABETH INN, (around the last week of June 2009), I noticed that a lot of odors and fumes had been getting into my room from one of the neighboring units (the room above, below or beside me) – so I went to CARLA and asked if she could please tell the above mentioned neighbors about my disabilityof asthma, allergies and chemical sensitivity and request in a non accusatory way – if they not over use cleaning and chemical products to the extent that they odors would get into my room. Although CARLA told me that my request was reasonable, she neve got back to me to tell me if she had spoken to my neighbors or to ask me if my situation had changed. More importantly, she never told me when I met with her in June 2009 that I should file an in house com-

-4-

plaint or an incident report about what I was experiencing – because it would have allowed me to mediate the situation with my neighbors in the presence of herself (the manager) and my assigned case manager. THIS POINT WOULD LATER PROVE TO BEING SIGNIFICANT, BECAUSE 4 MONTHS LATER IN OCTOBER 2009, when I spoke to CARLA about something that had nothing to do with my disability, or a disability accommodation, she told me that "I should file an incident complaint about it." But again, she didn't do the same when I asked for her assistance from getting sick from odors and fumes that had been getting into my room.

14.     Because I continued to get odors and fumes in my room and I felt like I was alone in addressing the situation, I got window fans to remove the odors and fumes.

15.     Then 3 months later on September 21, 2009, CARLA calls me to meet with her in Her office and she tells me that she's been receiving complaints from the neighboring building about the sound of my window fans and she tells me to stop using the 4 fans that I've been using and to just use one. Then she hands me a letter dated September 21, 2009, that states the same. Because CARLA also told me that she'd went outside between the 2 buildings (MARY ELIZABETH INN and the neighboring building) with a police officer and they didn't think that my fans were loud – I didn't know what to say, because I've used fans before in the past (since having asthma and chemical sensitivity) and I 've never had a complaint from a neighboring building about the sound of my fans. And because CARLA also said that there were no complaints from MARY ELIZABETH INN residents about my fans, I just said that because I couldn't control what other residents used In their rooms (in terms of the cleaning or chemical products that they used) "I Needed the fans to protect from my condition of asthma and chemical sensitivity from being exacerbated and how it affected my ulcers and inflammatory bowel disease condition. And I gave CARLA permission to tell the neighboring building management about my disability (verbally and in writing) on the same day. However, I was very much concerned about the fact that CARLA had:

(a) Not talked to me about the complaints when they first came in.

(b) Had not asked me if I was using fans and if so what was the purpose of using fans – which would have given us the opportunity to try to mutually resolve the matter before it got to the point where she wrote me a letter (that was essentially a write up) that she cc:d/forwarded to the Director Amanda Heier, before I had the opportunity to tell her that I was using the fans for my dis- ability or to provide her with doctor's letters that explained the above.

16.     2 days later, I gave CARLA a letter from my primary doctor at Tom Waddell

City Public Health Clinic that said that I needed fans to ventilate for my condition Of allergies and asthma. And 3 days later, I gave them a letter from my G.I. Doctor from UCSF that said that I needed to use fans to remove chemicals from my room. THEN FOR AN ENTIRE MONTH AFTER SUBMITTING THE LETTERS I RECEIVED NO FURTHER WORD FROM EITHER THE MANAGER CARLA BELLE OR THE DIRECTOR AMANDA HEIER ABOUT A RESIDENT FROM A NEIGHBORING BUILDING COMPLAIN-ING ABOUT MY WINDOW FANS. NOT UNTIL 1 MONTH LATER, ON OCTOBER 20, 2009 WHEN CARLA LEARNED THAT I WAS NOT GOING TO MOVE.

17.   Although I had applied to another hotel to move to (after I felt that CARLA was trying to evict me / when she delayed in telling me about the complaints about the fans) I hadn't told anyone at MARY ELIZABETH INN about what I had done. But on October 20, 2009, I saw CARLA in the lobby and she told me that she'd "mailed back papers to a hotel that I had applied to live in." And because I had decided not to move into the William Penn Hotel because someone had tried to sell me drugs in front of the building, I told CARLA that I had decided not to move and why. Then the harassment that I had been subjected to at MARY ELIZABETH INN began to increase.

PRE TELLING CARLA / MANAGER THAT I WASN'T GOING TO MOVE

A.   The cook, LILLY, accused me of trying to eat dinner twice in the same day and refused to serve me, until a resident/volunteer, CARRIE, that kept a record of who had eatten, told LILLY "that I hadn't eatten my dinner yet."

B.   Although CARLA told me that I could pick my dinner meals up from the front desk (have the desk clerk order me a "held meal" at the front desk) when I ordered a held meal, the desk clerk ELENA told me "that LILLY refused to prepare my held meal because she didn't believe that CARLA had approved it. even though CARLA told ELENA (after she phoned her at her home at my re-quest) "that she had approved my getting a held meal. However, ELENA did say that CARLA should have informed the staff that I had been approved to receive held meals.

C.   Someone left a sweater outside my room door knob that was full of perfume.

D.   A resident poured pinesol on the 2nd floor hallway carpet leading to my room. Although I immediately told CARLA about this – and she and other residents witnessed that this had been done – when I asked her to write a memo to the residents requesting that they not use chemicals in the hallways and in public/ common, I had to ask her 2 times (after waiting for a week) before this was finally done.

-6-

E.  Even though the above memo was put in all of the residents boxes, two female
    residents were involved with cleaning a chair with chemical right by my room,
    (not even a step away from my room) and they left the chair to dry with the bottle
    Of chemicals and the gloves and rags that they used to clean the chair on the
    floor by the chair. Although I had a witness and immediately wrote an incident
    report about this and asked CECELIA to put it in CLARLA'S box, CARLA NEVER
    GOT BACK TO ME ABOUT MY COMPLAINT THAT DIRECTLY HAD TO DO WITH MY
    DISABILITY AND THE MEMO THAT SHE HAD WRITTEN. AND I RECEIVED NO WORD
    FROM HER OR MY ASSIGNED CASE MANAGER NICHOLE FOR THE PARTIES IN-
    VOLVED TO MEDIATE THE MATTER.

    Special Note! 1 month later after I made the above 9/30/09 incident report, on
    October 28, 2009, I asked DORREY, the resident in 219 that owned and was clean-
    ing the chair if CARLA ever spoke to her about cleaning her chair by my room,
    DORREY said "no." So I mailed the incident report to CARLA on 10/25/09, but I
    have yet to receive any word from her, or my assigned case manager (that CARLA
    refers complaints to) NICHOLE about it – WHEN THEY DID CONTACT ME ABOUT A
    COMPLAINT THAT CARLA SUGGESTED THAT I WRITE THAT HAD NOTHING TO DO
    WITH MY DISABILITY. AND THIS MAKES ME BELIEVE THAT CARLA DOESN'T CARE
    ABOUT MY DISABILITY OR BEING ACCOMMODATED FOR IT.

POST TELLING CARLA THAT I WASN'T GOING TO MOVE

A.  1 day after, on October 21, 2009, someone left a raggedy silver cart by my room –
    that blocked the small halway. And one of the maid's questioned me in an accusa-
    tory way – as if the cart belonged to me.

B.  2 days after, on October 22, 2009, another maid that I passed in the hall somehow
    walked ahead of me and as I was about to enter my room she began to spray
    lemon pledge on my door and clean my door with a look on her face like something
    was funny, while wearing a mask over her nose and mouth.

C.  And by that same evening on October 22, 2009, as I was about to pick up my held
    meal at the front desk, a desk clerk (I forgot her name) told me that CARLA was on
    the phone and wanted to talk to me. And when I took her call at the desk, she im-
    mediately told me "that she'd gotten another complaint from the neighbor from
    the neighboring building about the sound of my fans." And I told her that "it
    seemed bizarre that as soon as I said that I had decided not to move that after an
    entire month of no complaints that the complaints started up again. And she
    abrasively stated "that you didn't want to take my suggestion (in reference to the
    9/21/09 meeting) for the management to install a ceiling fan in your room." Then
    I told her as I did on 9/21/09 "that a ceiling fan would just blow air on me and cir-
    culate air around my room and that I would get a cold from it blowing air on me."

-7-

And I also told her that "an air purifier doesn't remove odors and fumes from a room as quickly as windows fans, and that I didn't feel comfortable about discussing my private business at the front where other residents could hear."  So CARLA told me that "she wanted to meet with me the next day at 1L00 P.M. in her office so that we could resolve the matter about the neighbor from the neighboring building complaining about my fans." Although I agreed to meet with her the following day, she was an hour late for our meeting.

18.     While I waited for CARLA to show up, I gave CECELIA a letter for her and I asked CECELIA to put it in CARLA'S box. The letter dated October 22, 2009 stated that I didn't feel comfortable about meeting with her bout what I would and would not agree to before I had the opportunity to speak to someone that could answers my questions and advise me about my housing rights - because CARLA had shown me by continuing to insist that I use ceiling fans that she was trying to impose what she thought was best for me when she didn't have my conditions. That's why I told her in the letter that I needed at least a week to try to find someone that could advise me. Although I reinterated this verbally and in writing to CARLA and a a case manager named ROBIN that CARLA had asked to sit in on the meeting, CARLA  dismissed my request and proceeded with the meeting and told me that She had 3 options to resolve the problem with the complaints. (1) she would have a ceiling fan installed above my bed – and I again stated why this would not work. (2) she would get me a quiet industrial fan that had the power of 4 commerical fans – which I was open to (3) she would move me to from the back of the building to the front of the building (that faced Bush Street).  However, when I asked her If this room was near where the smokers were allowed to smoke (on the balconey) she said "yes."  And based on this I told her that because I have asthma I can't be near where the smokers are allowed to smoke, because (a) smoke gets in the hallways (near the balconey) because of the smokers going in and out of the door to smoke on the balconey (b) some of the smokers don't adequately close the balconey door and sometimes leave the balconey door open and (c) when residents smoke on the balconey – their smoke can travel to residents nearby rooms if the residents window is open. And because CARLA didn't say anthing about ending the policy of allowing the smokers to smoke on the balconey – near residents rooms – and move the smokers away from residents room (to the outside court yard and or on the roof, I could see that she was not interested in enforcing the CITY'S smoking ban in buildings – so I could move to another room that fans – while she did want to enforce the City's noise ordinance to accommodate the neighbor in the neighboring building.

Before the meeting ended, I told CARLA "that my mom was sending my air purifier (from Cleveland) that I had always used in conjuction with fans – but that an air purifier alone was not enough to protect my conditions from being excerbated by odors and fumes.

It is also important to add that in the letter that I wrote CARLA dated October 22, 2009, I pointed out to her that I had recently learned from a fellow resident that there was a a WARNING SIGN outside THE MARY ELIZABETH INN BUILDING that was in an obscure place that was difficult to find. And the sign said "THAT THIS BUILDING HAS DETECTABLE TRACES OF CHEMICALS, ABESTOS, CARBON MONIXIDE, BENZENE, LEAD, SMOKE, ETC., KNOWN BY THE STATE OF CALIFORNIA TO CAUSE CANCER" and because this was never put in my lease, I mentioned this to CARLA in the letter in the hope that she might consider accommodating me in another property that they have on Jones and Eddy, or her being more sensitive to my use of fans at MARY ELIZABETH INN. However, since I gave CARLA the letter, she has never talked to me about the WARNING SIGN outside the building in relationship to my disability accommodation.

19. Then on Monday, October 26, 2009 CECILIA buzzed my room at around 8:10 A.M. and I assumed that it was CARLA. And because I had not yet had the opportunity to speak to Someone about my rights so I was beginning to feel the stress of CARLA pressuring me and wanting to meet with me before my questions were answered about my rights. Specifically: Would I lose my housing rights if I moved to another room? Would I have to go another 30 days before I became a resident in a new room? Did I have to move when my room was away from where the smokers smoked and when it was away from the community bathrooms where the maids clean and there's odors from various products that the residents use?

Anyway, I tried to avoid CARLA and I got to the RENT BOARD and one of the counselors told me "not to move," and that "my management should not be harassing me about complaints that are coming from another building – because the housing law only covers noise complaints that come from my own residence and because I wasn't getting any complaints from where I lived my management should not be bothering me." However, because I knew that the person that I was talking to was not a lawyer I still had questions about the noise ordinance and I didn't want to do anything that could cause me to get evicted.

20. By the time I got home CECELIA told me "that CARLA had been trying to get in touch with me, and because I was unavailable that day that she wanted to see me at 8:00 A.M. the next morning on Tuesday, October 27, 2009. And again, because I still had questions about my housing rights and had not had the opportunity to speak to someone that could really advise me I felt pressured by CARLA not respecting my verbal and written request that I relayed on Friday October 23, 2009 to give me a week to find someone that could advise me before she put me in the position making commitments about what I would and would not do before being aware of my housing rights.

21. At 8:12 A.M. the next day on Tuesday, October 27, 2009, CECELIA INFORMED CARLA That I was waiting for her at the front desk. And rather then CARLA calling me back to

come into her office, she came out to the desk with paper in her hand and told me "that I needed to sign the paper in order for her to buy me an air purifier." Although I already had an air purifier (that I told her about in our 10/23/09 meeting) that my mom had mailed, I didn't understand why she wanted to get me an air purifier. And I was also afraid that if I didn't sign that paper that CARLA would try to evict me as a way to evict me – because she'd already evicted 2 women on my floor and she told me when when I first moved in "that she could evict people out as fast as she let them in." So when I signed my name on that paper with reading it, I felt intimidated and pressured into doing so – before I was given the opportunity to speak to someone that could advise me. And I was coerced when I saw THAT THE AGREEMENT HAD LESS TO DO WITH HER WANTING ME TO SIGN IT SO THAT SHE COULD PURCHASE AN AIR PURIFIER. SPECIFICALLY:

(A) First, she never told me during our meeting on 10/23/09 that she was preparing an agreement that she wanted me to sign.

(B) Nothing in that agreement was agreed to or talked about during our 10/23/09 Meeting.

    1   She never said in our meeting (that in the room that I am presently in) that I had to stop using any fans – that I couldn't even use 1. And that I could only use 1 air purifier in my room. And because the police said that the 2 fans that I began just using on 10/27/09 were not loud or disturbing and that I could continue to use the 2 fans – certainly 1 fan would not exceed the what is not acceptable within the stand of the City's noise ordinance. But the fact that CARLA was taking away my shield of a single fan, showed me that CARLA was not trying to accommodate me for my health, CARLA was trying to harass and harm me.

    2   Although her option 2 in our 10/23/09 was to get me a quiet industrial fan that had the performance power of 4 commercial – the industrial that she had mentioned was excluded from the agreement.

    3   We also never spoke about me being moved to a room in the inner court yard – that sits in a valley surrounded by 4 walls of buildings and where I would have less chance to get fresh air. Also all the rooms in the inner court yard face the open windows of the community bathrooms and I would get the odors from the bathrooms (the maids cleaning products and the various products that the residents use). Yet CARLA put this in this in the agreement that she had coerced and intimidated me into signing.

    4   Finally, once they planned to move me to the inner court yard (where there are more odors and fumes / and less chance to get fresh air – I was limited

-10-

to just using 2 fans. And again, the agreement never mentioned CARLA'S
10/23/09 promise to get me a quiet industrial fan that had the performance level
of 4 commercial fans.

SPECIAL NOTE! I would later learn on November 9, 2009 during a meeting with
the director, AMANDA HEIER and a housing advocate from the SRO collaborative
that was present that AMANDA said "that once I was moved to
the inner court yard then they could see (in terms of the management) if my
my fans were loud." And a disability accommodation should not have to do with
the management wanting to see if my fans are too loud / or to set me up so that I
could get complaints from residents in my building (which up to now

I have not been getting). A disability accommodation, understandably should be
"reasonable," but it should be about what accommodates me (at my exspense) for
my disability and not what the management want to pay for or to unfairly impose.

Although I was completely stressed out and cried after I signed that agreement,
because I did not want to get evicted from the date of October 27, 2009 I'VE ONLY
BEEN USING 2 FANS IN MY ROOM AND I REDUCE THE LEVEL OF MY FANS
AT NIGHT BETWEEN 10:00 P.M. and 8:00 A.M. However, neither CARLA or
AMANDA have asked me if I was only using 2 fans and CARLA has never gotten
back to me to tell me if she had purchased the air purifier that she wanted me to
sign to get – while the air purifier that my mom mailed me – that I've always used
in conjuction with fans, arrived on October 26, 2009. Interesting enough with just
the 2 fans and my air purifier, between October 26, 2009 thru October 30, 2009 I
didn't hear about any complaints from the sound of my 2 fans from either CARLA or
AMANDA.

22. Then on Trick or Treat Halloween night, on October 31, 2009 adesk clerk named
MEGAN CALLED ME FROM THE DESK at around 10:07 P.M. and told me to "cut
off my fans because a man from the neighboring building was complaining
about the sound of them. And I told MEGAN that "I was going to call the police."
Particularly when I was only using 2 fans and I felt like I was being harassed."
And when the police show up, two officers witnessed that I was only using to
and they said "that my fans weren't loud and they left." After they relayed this
MEGAN she made a note of what the police said in the desk log book and also
documented it in an incident report to AMANDA. I did the same and completed
an incident report that I addressed to CARLA, but I have yet to get a response.

23. Also, around October 29, 2009, I wrote another complaint bout the in house male
custodial worker not inspecting my room for roaches and bugs on Thursday,
October 29, 2009 – when he had always left me a new monthly roach trap and had

-11-

24.   Because I was having stomach pains and bowel problems, I went to UCSF'S Emergency
       Room on November 2, 2009 and they admitted me into the hospital. And I stayed as an
       in patient until I was discharged On November 8, 2009. During my in patient stay I was
       surprised that my G.I. doctor, Dr. Mahadaven never came to see me or had one of the
       doctors that worked with her to come and see me, when the attending medical doctor
       told me that "she would tell Dr. Mahadaven that I was in the hospital."

25.   On the night of November 8, 2009, when I was discharged home and asleep in my bed,
       A desk clerk named ELENA, knocked on my door and awoke me from my sleep to tell
       Me that s he had gotten a complaint from the man in the neighboring building about
       The sound of my fans, so I immediately opened my door and invited ELENA to come into
       My room and witness that I was only using 2 fans and the level of the fans were reduced.
       As ELENA entered my room she apologized and told me that "she didn't hear my fans as
       She approached my door and that my fans were not loud." And after she saw that the
       Level of my fans had been reduced, I began to cry and said that "I was going to call the
       Police because I was tired of being harassed by a neighbor that was trying to get me
       Evicted." (And I question if the management is not involved.) Then ELENA told me
       That this man had been abusive and threatening to the desk clerks and had threatened,
       Per, REBECCA, "to cut her with a knife." ELENA also said "that when she was on duty
       Another time, that the police showed up and told her that "they couldn't hear any noise
       From my fans and left" and "that she was upset that REBECCA didn't make a police
       Report about the man threatening to cut her because he sounded dangerous."

       Our conversation ended with us both documenting the incident and that the police
       Came and again witnessed t hat my fans were not loud. But even though I did an
       Incident report on November 8, 2009, I have yet to get a response from either CARLA
       Or AMANDA.

26.   On Thursday, November 9, 2009, I had the opportunity to meet with AMANDA in the
       Presence of a housing advocate from the SRO Collaborative – and brought up the
       following:

       a.   That thought that I was still using 4 fans, because she and CARLA avoid speaking to
            Me – as well as not responding to my incidents reports that documented that I was
            Using just 2 fans (since October 27, 2009).

       b.   If I asked her if the management could have noise test from the rooms of the
            Persons in the other building that were complaining – so we could see if the
            complaints were valid, she said that "that was not going to be done."

       c.   She mentioned that she "wanted to move me to a room in the inner court yard
            and then they would be able to see if my fans were loud." (which again is not the
            right reason to move me to another room) in the context of my needing a disability

                                              -12-

    d.    She commented that "the management had brought me a purifier that I had refused to use." And when I told her that "I never refused to use an air purifier that I was using my own from Cleveland" (that had arrived before Carla had me to sign that agreement) and that CARLA never told me that she had purchased the air purifier." Amanda said "well, you wrote on the agreement that you wouldn't use the air purifier by itself – that's why CARLA said that she was not going to give it to you – if you were not going to use it." When I reinterated that "I never said in a statement that I wouldn't try to use whatever air purifier that Got me without fans. I said, that I would try it – but if it didn't work by itself to protect me from fumes – that I would at least use 2 fans with the air purifier – because I had always used both at the same time."

    E    Then when AMANDA said that our (the owner/management's attorney) spoke to Your doctor last week and she, Uma Mahdaven, told our attorney "that you didn't Need to use any fans that an air purifier by itself was enough.

27.  AT THIS POINT I WAS ANGRY AND SHOCKED THAT A LEGAL REPRESENTATIVE FROM MARY ELIZABETH INN HAD NOT ONLY SPOKEN TO MY DOCTOR WITHOUT EITHER MY DOCTOR OR THE MARY ELIZABETH INN MANAGEMENT ASKING ME TO SIGN A RELEASE FOR THEM TO DO SO – BUT I WAS UPSET BY THE FACT THAT MY DOCTOR COULDN'T TALK TO ME OR VISIT ME WHEN I WAS IN THE HOSPITAL – BUT AT THE SAME TIME THAT I WAS IN THE HOSPTIAL SHE COULD TALK TO THEIR LAWYER. AND I WAS UPSET BY THE FACT THAT MARY ELIZABETH INN HAS A "PROTOCAL" IN REGARDS TO COMMUNICATING WITH A RESIDENT'S DOCTOR ABOUT THEIR DISABILITY ACCOMMODATION REQUEST – AND IT DOESNOT BEGIN WITH THEIR LAWYER GETTING IN THE FACE OF ONE OF MY DOCTORS. The protocol is – is the management asks me to sign a release – so they can send my doctor a form to fill out if they need more then a letter to verify a residents disability accommodation need. And because neither CARLA, AMANDA, or their lawyer asked me to sign a release to forward disability accommodation verification forms to my doctor for 1 month after they received those letters (with no complaints about my fans). They could have at least adhered to their own standard policy and way of addressing disability accommodation requests. However, because they did not ask me to sign a release and go through the standard protocal– they discriminated against me with their own policy. And by doing so my rights were violated and they interfered with my relationship with my doctor.

28.  When I told AMANDA "that I never signed a release for anyone from MARY ELIZABETH INN talk to my doctor, AMANDA said, "yes you did. You signed a release for a disability accommodation." And I followed with "well I would like for you to give me a copy of the release I was suppose to have allegedly signed that I did not sign." And AMANDA said" I'll get it to you." But when I asked to speak to AMANDA the next day on November 10, 2009, CECELIA told me "THAT AMANDA IS WORKING FROM HER HOME ALL DAY." And when asked CARLA moments later "if she would give me a copy of the release that I know I didn't sign," she told me "that she would get back to me – but has been avoiding me ever since.

29. Based on all of the above instances of harassment and discrimination that I've been subjected to at MARY ELIZABETH INN – with the breaking point of their lawyer, John Zanghi, not following MARY ELIZABETH'S INN'S own policy/protocol for securing disability Verification information from a disabled residents doctor, I wrote a letter to CARLA and AMANDA, dated November 10, 2009, that I also hand delivered to their attorney John Zanghi, Informing them of the fact that I was "constructively evicting" from Mary Elizabeth Inn. And I told CARLA and JOHN ZANGHI on the same day, "that the only way that I would consider staying in MARY ELIZABETH INN – is if they enforce the CITY's smoking ban in buildings so that I could take the room facing Bush Street – that CARLA offered as a disability accommodation – that I couldn't take because of the reasons that I stated in this lawsuit complaint. However, although all of the above parties were concerned about enforcing the CITY'S noise ordinance, I have yet to hear a response to my request/proposal – even though the following day on November 11, 2009 I forwarded CARLA, AMANDA and JOHN ZANGHI letters that offered reasonable suggestions regarding areas that the smoking residents could smoke – that were not near residents room.

30. Finally, on Friday, November 13, 2009, I had the opportunity to speak to Dr. MAHADAVEN And she told me "that she didn't appreciate MARY ELIZABETH INN'S attorney JOHN ZANGHI Harassing her and her office.." When I told her "that I never knew that he had called her and that I had never signed a release for anyone at Mary Elizabeth Inn to speak to her," she became less angry but she was still upset. When I asked her if she had said what the director, AMANDA HEIER told me she had said "in terms of a purifier being adequate and I wouldn't have to use any fans," because the lawyer told her that people weren't brothering me with chemicals near my room anymore." And I said that I am still affected by chemical odors / fumes from neighboring rooms – and I doubt if MR. ZANGHI told you that the building has a warning sign in the front of it – that says that it has detectable traces of chemicals that causes cancer. And some residents sneak and smoke in their rooms and in the bathroom – and they allow residents to smoke near residents and smoke gets in the hallway," she said that "she was a G.I. doctor and couldn't speak on or about my asthma condition and within that context I may need to use fans." Then she added that the stress that I've been going through can't be good for my ulcerated colitis condition." However, I told her "that because she had spoken to Mary Elizabeth's Inn's lawyer without her asking me to sign a release – that I was releasing her from being my doctor." And I added that MR. ZANGHI knew that there is a protocol that the management had to follow in regards to getting disability verification from a her." "I first had to sign a release and they would send her disability verification forms to complete – but they did not do this."

## VI. DAMAGES

31. Plaintiff has no plain, adequate or complete remedy at law to redress the wrongs alleged herein and this suit for an injuction and declaratory judgement is my only means of securing

-14-

adequate relief. Unless enjoined, the defendants will continue to engage in the unlawful acts
And the pattern or practice of discrimination described above. Plaintiff has no adequate
Remedy at law. Plaintiff is now suffering and will continue to suffer irreparable injury from the
defendant's acts and their pattern or practice of discrimination against disabled women unless
relief is provided by this court. Accordingly, plaintiff is entitled to injuctive rerlief.

32. As a direct and proximate result of the injuries inflicted upon plaintiff as a result of the
wrongful and malicious acts of defendants alleged herein, plaintiff has suffered great
embarrassment and humiliation, great emotional anguish, mental distress and loss of dignity
and pride in an amount yet to be determined.

33. Plaintiff will have to face being homeless, because she is essentially being forced out of her
Housing.

34. The conduct of defendants was willful and malicious with the intent of depriving plaintiff of
her basic rights as an American citizen to rent housing without discrimination and harassment
Because of her disability. Defendants acts were willful, malicious and oppressive and done with
the intent of depriving plaintiff of her right to housing as protected by federal, state and local
laws. The acts were such a nature that punitive damages should be imposed against each
defendant.

35. Plaintiff found it necessary to file a lawsuit to vindicate her rights under the law.

VII.

A.  FIRST CLAIM FOR RELIEF

{FAIR HOUSING ACT}

36. Plaintiff realleges and reincorporates by reference paragraghs 1 through 35, inclusive, of
the Complaint herein.

37. The defendants injured plaintiff in violation of the Federal Fair Housing Act by committing
the following discriminatory housing practices:

- (a)  Discriminating in the terms , conditions, or privileges or in the provision of services
  Or facilities in the rental of a dwelling because of race or sex in violation of 42 U.S.C.
  & 3604 (b); and

- (b)  Coercing, intimidating, threatening, or interfering with any person in the exercise
  Or enjoyment of, or on account of his having exercised or enjoyed, or on account of
  His having aided or encouraged any other person in the exercise or enjoyment of
  Rights guaranteed by the Fair Housing Act, in violation of 42 U.S.C. & 3617.

-15-

(c)  A refusal to make reasonable accommodations in rules, policies, practices, or
     services, when such accommodations may be necessary to afford such person equal
     opportunity to use and enjoy a dwelling 42 U.S.C. 3604 (3)(B)

WHEREFORE, plaintiff prays for relief as hereinafter set forth.

### B.  SECOND CLAIM FOR RELIEF

{California Unruh Civil Rights Act, California Civil Code && 51, et seq.}

38.  Plaintiff realleges and reincorporates by reference paragraghs 1 through 35, inclusive, of
The Complaint herein.

39.  In doing the things herein alleged, defendants, by and through a pattern or practice of dis-
Crimination on the basis of disability, have violated the rights of individuals to fair housing
under the Unruh Civil Rights Act, Californai Civil Code && 51, et seq., in that defendants
discriminate based on the race and sex of individuals in the management and operation of the
MARY ELIZABETH INN RESIDENTIAL HOTEL, a business establishment.

40.  The conduct of defendants alleged herein constitutes a denial of full and equal access to
housing accommodations within the meaning of California Civil Code & 51.1(b).

WHEREFORE, plaintiff prays for relief as hereinafter set forth.

### C.   THIRD CLAIM FOR RELIEF

{California Fair Employment and Housing Act, Government Code && 12926-95}

41.  Plaintiff realleges and reincorporates by reference paragraphs 1 through 35, inclusive, of
the Complaint herein.

42.  Defendants injured plaintiff in violation of the California Fair Employment and Housing Act,
specifically California Government Code && 12926-95, by committing the following
discriminatory housing practices:

> (a)  Discriminating against and harassing plaintiff because of race or sex in
>      violation of California Government Code & 12955 (a) and (d);
>
> (b)  Discriminating and harassing plaintiff in retaliation for plaintiff opposing
>      Defendants's unlawful housing practices in violation of California Gover-
>      ment code & 12955 (f); and

WHEREFORE, plaintiff prays for relief as hereinafter set forth.

## D. FOURTH CLAIM FOR RELIEF

{Unfair Business Practices, California Business & Professions Code & 17200}

43. Plaintiff realleges and reincorporates by reference paragraphs 1 through 35, inclusive, of the Complaint herein.

44. In doing the things herein alleged, the defendants have engaged in a pattern or practice of Unlawful discrimination in the operation of the rental premises, business establishment, and therefore have engaged in acts of unfair competition as the same is defined in California Buisness & Professions Code & 17200.

45. In bringing this action for injunctive releief, plaintiff is acting in the interest of itself and the general public pursuant to the California Business & Professions Code & 17204.

WHEREFORE, plaintiff prays for relief as hereinafter set forth.

## E. FIFTH CLAIM FOR RELIEF

{Negligence}

46. Plaintiff realleges and reincorporates by reference paragraphs 1 through 35, inclusive, and Paragraph 35 of the Complaint herein.

47. Defendants owed plaintiff a duty to manage and operate the Mary Elizabeth Inn residential hotel in a manner that was free from unlawful discrimination and to hire, train, supervise and discipline their employees, against, and each other to fulfill that duty. Defendants negligently violated that duty by discriminating against individuals on account of their disability, race and sex. Defendant's violation of that duty was the result of negligence, including but not limited to:

   (a) Defendants' negligent failure to train their employees and each other regarding the requirements of state and federal fair housing laws;

   (b) Defendants' negligent failure to hire persons who were familiar with the requirements of state and federal fair housing laws;

   (c) Defendants' negligent failure to supervise their employees and each other regarding compliance with the requirements of state and federal fair housing laws; and

-17-

(d) Defendants' negligent failure to discipline or terminate employees who failed to comply with the requirements of state and federal fair housing laws.

WHEREFORE, plaintiff prays for relief as hereinafter set forth.

(e) Because the management is pressuring me to move from my room to other room locations that are not accommodating, (facing the bathroom odors or near the smokers) when the police said that my 2 fans are not loud, and the management is not open to doing a sound/noise test from the rooms of any neighbor in the neighboring building that is complaining about the sound of my 2 fans – so we can know if any complaints about my 2 fans have any real basis, I believe that the management is unfairly trying to force me out of my room so that they can recover possession of it. And because they won't enforce the City's no smoking ban in buildings – which would have enabled me to move to a room that faced Bush Street - where I could have used my 2 fans without complaints from outside neighbors - and that had fresh air – unlike the inner court yard room location that was offered me – that sits in a vacuum of 4 walls that face the open windows of the community bathroom and its fumes. Section 37.9 (f) of the Rent Ordinance provides that whenever a landlord wrongfully endeavors to recover possession of a rental unit in violation of Section 37.9 the tenant may institute injunctive relief, monetary damages of not less than 3 times actual damages, attorney fees and whatever other relief the court deems appropriate.

WHEREFORE, plaintiff prays for relief as hereinafter set forth.

F. SIXTH CLAIM FOR RELIEF

{Constructive Eviction}

48. Plaintiff incorporates in this cause of action paragraphs 1 through 47 of this Complaint.

49. As a direct proximate result of the acts and omissions of defendants, plaintiff for forced to give notice to move.

50. Defendants acted with the specific intention of causing plaintif's living situation to become so intolerable that I was forced to give notice to constructive evict.

51. As a direct and proximate result of the aforementioned acts of defendants, and each of them, plaintiff has suffered general and special damages in an amount to be proven.

WHEREFORE, plaintiff prays for relief as hereinafter set forth.

### G. SEVENTH CLAIM FOR RELIEF

### {Negligent Infliction of Mental Distress}

52. Plaintiff incorporates in this cause of action paragraph 1 through 47 of this Complaint.

53. As direct proximate result of the aforementioned acts and omissions on the part of defendants, plaintiff has suffered and continues to suffer substantial emotional and physical distress.

54. Said conduct on the part of defendants would have caused a reasonable person to suffer substantial emotional and physical distress.

55. As a direct and proximate result of the aforementioned acts by defendants, resulting in plaintiff having suffered emotional and physical distress, plaintiff has been and continues to be generally and specially damaged in an amount according to proof.

WHEREFORE, plaintiff prays for relief as hereinafter set forth.

### H. EIGHTH CLAIM OF RELIEF

### {Intentional Infliction Of Mental Distress}

56. Plaintiff incorporates in this cause of action the allegations of paragraph 1 through 55 of this Complaint.

57. As a direct and proximate result of defendant's acts and omissions, plaintiff has suffered extreme mental distress, all to her general damage in an amount according to proof.

58. Defendant's conduct was knowing, intentional and willful. Defendants had full knowledge or substanitial certaintly of t he extreme mental distress that their conduct would cause plaintiff.

59. Defendant's conduct was malicious and oppressive, and therefore plaintiff is entititled to punitive damages.

WHEREFORE, plaintiff prays for relief as hereinafter set forth.

CONTACT INFORMATION

1.  Plaintiff, Ilene Sands, Mary Elizabeth Inn, 1040 Bush Street, room 208, San Francsico, CA 94109, (415) 673-6768.

2.  Defendant, Amanda Heier, Mary Elizabeth Inn, 1040 Bush Street, San Francisco, CA 94109, (415) 673-6768

3.  Defendant, Carla Belle, Mary Elizabeth Inn, 1040 Bush Street, 1040 Bush Street, San Francisco, CA 94109

4.  Defendant, John Zanghi, Attorney, 703 Market Street, suite 1600, San Francisco, CA 94103, (415) 977-0444 ext 22

5. Defendant, Cal Properties Womans Div.
   Care of legal office 1441
   475 Riverside Drive
   New York City, N.Y. 10111

SIGNED: Ilene Sands/ Ilene Sands
DATE: 11/17/09

-20-